IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHAEL LOGAN LOWERY,               §
                                    §
            Petitioner,             §
                                    §
v.                                  §          No. 4:18-CV-361-Y
                                    §
LORIE DAVIS, Director,              §
Texas Department of Criminal        §
Justice, Correctional               §
Institutions Division,              §
                                    §
            Respondent.             §


**OPINION AND ORDER**

Before the Court is a petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254 filed by Petitioner, Michael Logan
Lowery, a state prisoner, against Lorie Davis, director of the
Texas Department of Criminal Justice, Correctional Institutions
Division, Respondent. After having considered the pleadings and
relief sought by Petitioner, the Court has concluded that the
petition should be denied.

**I. FACTUAL AND PROCEDURAL HISTORY**

On October 7, 2014, in Comanche County, Texas, Case No.
CR03693, a jury found Petitioner guilty of murdering his wife,
Amber Lowery, and assessed his punishment at life imprisonment.
(Clerk's R. 115, doc. 13-14.) Petitioner appealed his conviction,
but the state appellate court affirmed the trial court's judgment
and the Texas Court of Criminal Appeals refused his petition for

discretionary review. (Docket Sheet 2, doc. 13-2.) Petitioner also filed a post-conviction state habeas-corpus application challenging his conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. (SHR[1] 4-23 & Action Taken, docs. 13-36 & 13-27, respectively.)

The state appellate court summarized the evidence at trial as follows:

> On July 23, 2013, [Petitioner] and his wife, Amber Lowery, were living on a ranch in Comanche County about six miles east of Rising Star. Amber and [Petitioner] had a rocky relationship, described as having many ups and downs. Amber had previously filed for divorce on two occasions. [Petitioner] was known to have an explosive temper. He had previously broken Amber's nose and had attended two anger management courses prior to the events of July 23.

> The evidence offered at trial established that both Amber and [Petitioner] had discussed their marital difficulties with others. In September 2009, Amber communicated with [Petitioner]'s brother, David Lowery, over the telephone and through Facebook messages. She told him that she was considering divorce and described her relationship with [Petitioner] by stating, "Life has been hell." During 2008 and 2009, [Petitioner] was working in Africa flying helicopters. On one occasion, [Petitioner]'s coworker, Michael Pandol, overheard [Petitioner] having a heated telephone conversation with someone. [Petitioner] was screaming, cursing, and causing a disturbance amongst the other pilots. Pandol later discussed [Petitioner]'s marital problems with him. [Petitioner] told Pandol that he would "kill that b---h and bury her where nobody will find her."

> In 2013, [Petitioner] was working as a helicopter pilot in Sabine Pass. His job required him to alternate spending two weeks in Sabine Pass and then two weeks at

---

[1] "SHR" (state habeas record) refers to the record of Petitioner's state habeas proceeding in WR-87,430-01.

home. On July 23, [Petitioner] was scheduled to drive back to Sabine Pass to begin a two-week stint for his job. Early that morning, [Petitioner]'s friend, Andres Mendoza, had been at the Lowerys' ranch. Mendoza testified that, while he was there, he felt a tension between [Petitioner] and Amber. [Petitioner] left home that afternoon to return to work in Sabine Pass.

At 3:08 p.m., during [Petitioner]'s drive to Sabine Pass, he began receiving text messages from Amber. Amber was upset because she believed that [Petitioner] had deleted photographs of her deceased parents and had locked her out of the safe. The text messages between Amber and [Petitioner] became increasingly heated, and Amber eventually told [Petitioner] that she had made an appointment with a divorce lawyer. [Petitioner] responded by stating, "Sending paperwork is the worst mistake you can make." It was later discovered that this text message was deleted from [Petitioner]'s phone before it was turned over to law enforcement.

Meanwhile, Amber had been in communication with her brother, Ryan Christensen. Amber had made plans to meet Christensen the next morning, July 24, at their deceased parents' home to go through some of their parents' things. Amber called Christensen at 7:19 p.m. and spoke to him for twenty-two minutes. Christensen testified that Amber told him that "[s]he was angry, she was upset and she was scared." She further told him that "if anything were to happen to me[,] . . . Mike had done it." The last time anyone received any communication from Amber was 9:36 p.m.

Sometime around 6:18 p.m., [Petitioner] decided to turn around and head back to his home. [Petitioner] arrived home at around 9:45 p.m. Later that night, Mendoza spoke to [Petitioner] on the phone. [Petitioner] was breathing hard and repeating, "Oh, man. Oh, man." Mendoza asked [Petitioner] if he had hit Amber. [Petitioner] replied, "[I]t's too late." Mendoza asked [Petitioner] to tell him what had happened. [Petitioner] asked Mendoza, "[A]re you my brother?" Mendoza replied, "[Y]eah, but don't tell me anything my heart can't handle." [Petitioner]'s demeanor immediately changed, and he told Mendoza, "[O]kay. No, we got in a fight. She took off."

The next morning, July 24, several witnesses saw

Amber's vehicle. [Petitioner]'s neighbor, Shae Southall, saw the vehicle on the ranch property at 7:00 a.m. A local shopkeeper and two of the store's regular customers saw the vehicle parked at an abandoned laundromat in Rising Star at around 7:30 a.m. That afternoon, another witness saw a man matching [Petitioner]'s description walking down the road near Amber's vehicle carrying an infant. She offered the man a ride, which he accepted, and drove him and the infant to the ranch where [Petitioner] lived.

Around mid-morning of the 24th, [Petitioner] dropped his five-year-old son off at a friend's house, telling the friend that Amber had left for Bluff Dale earlier that morning. However, Amber failed to appear at her parents' home in Bluff Dale to help her brother, Christensen, go through their parents' belongings. Concerned about his sister, Christensen called the police and asked them to perform a welfare check.

Later that evening, law enforcement officers visited [Petitioner] at his home. [Petitioner] told the officers that he and Amber had gotten into a fight the night before and that Amber had driven off. Over the next few days, investigators searched for Amber. They found her car at the abandoned laundromat in Rising Star. A helicopter flyover of the ranch revealed a burn pile on the property. When investigators subsequently searched the property, they noticed that the burn pile had been cleared and leveled off. They also noticed that a piece of heavy equipment located on the property had recently been used. On one particular piece of equipment, the lights had been left on and the battery had died, indicating it had last been used at night. Investigators eventually found human remains in the burn pile. A DNA analyst testified that it was 87 million times more likely that the remains belonged to Amber than from someone else.

[Petitioner] testified in his own defense. He denied that the conversation with Pandol ever happened. He stated that Pandol, Christensen, and Lowery held grudges against him. [Petitioner] had spent the two weeks prior to July 23 at home working around the ranch. This work included burning and clearing the burn pile, which he testified was done on the Friday before Amber's disappearance.

According to [Petitioner], Amber had a history of suffering from depression. She suffered from postpartum depression after the birth of their second child, and the recent loss of her parents had made her depression worse. She had threatened suicide in the past. [Petitioner] became concerned about Amber when she began sending heated text messages to him on his way to work. [Petitioner] had a "gut feeling" that Amber needed him, so he turned around and drove back home. When he arrived home, Amber was sitting outside. He attempted to talk to her but she refused. [Petitioner] heard his infant son crying, so he went inside to check on him. While inside, he heard Amber drive away. [Petitioner] testified that this was the last he ever heard from her. [Petitioner] testified that he still has hope that she will be found alive and that the human remains found on the property do not belong to her. [Petitioner] denied deleting any of his text messages. He also denied getting a ride from anyone on the afternoon of July 24.

(Mem. Op. 2-6, doc. 13-4 (footnote omitted).)

## II. ISSUES

In this federal habeas-corpus petition, Petitioner claims that there is no evidence to show that he caused "the death of an individual" or to support an inference that he "intentionally and knowingly" caused the death of an individual (ground one and two) and that he received ineffective assistance of counsel on appeal (ground three). (Pet. 7-9, doc. 3.[2])

## III. RULE 5 STATEMENT

Respondent does not assert that the petition is barred by the federal statute of limitations or successiveness, but she does

---

[2]Because pages have been inserted into the form petition, the pagination in the ECF header is used.

assert that Petitioner's "no evidence" claims under grounds one and two were not properly exhausted in state court and are procedurally barred. (Resp't's Answer 7, doc. 11.)

## IV. DISCUSSION

### A. Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute also requires that federal courts give great deference to a state court's factual findings. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting

the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003); *Williams v. Taylor,* 529 U.S. 362, 399 (2000).

Additionally, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *See Singleton v. Johnson,* 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court may assume that the state court applied correct standards of federal law to the facts and "should 'look through' the unexplained decision to the last related state-court decision providing "particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* 138 S. Ct. 1188, 1191-92 (2018); *Townsend v. Said,* 372 U.S. 293, 314 (1963).

### B. No Evidence

Under grounds one and two, Petitioner claims his conviction violates due process because there is no evidence in the record to show he "caused the death" of an individual or to support an inference that he caused the death of an individual "intentionally and knowingly," required elements of the offense of murder. (Pet. 7-8, doc. 3.) Respondent asserts that because Petitioner raised the

claims for the first time in his state habeas application, the claims were not properly exhausted in state court and are procedurally barred from federal habeas review. (Resp't's Answer 10-15, doc. 11.)

Under the procedural-default doctrine, a federal court may not consider a state prisoner's federal habeas claim when the last state court to consider the claim expressly and unambiguously based its denial of relief on an independent and adequate state procedural default. *See Coleman v. Thompson,* 501 U.S. 722, 729, (1991); *Johnson v. Puckett,* 176 F.3d 809, 823 (5th Cir. 1999); *Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir. 1999). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain,* 128 F.3d 900, 902 (5th Cir. 1997).

Under Texas law, while a no-evidence claim is cognizable on state habeas review, a sufficiency-of-the-evidence claim may only be raised on direct appeal. *See Ex parte Barfield,* 697 S.W.2d 420, 421 (Tex. Crim. App. 1985). Petitioner raised his "no evidence" claims in his state habeas application, and the state habeas court found that (1) there was some evidence presented at trial that Petitioner intentionally or knowingly caused the death of Amber Lowery by manner and means unknown and (2) there was some evidence presented at trial from which a reasonable juror could conclude that Petitioner killed Amber Lowery and did so knowingly and intentionally. (Id. at 107.) Thus, Petitioner's no-evidence claims

8

were properly exhausted in state court. Nevertheless, such a claim is a product of state law, rather than federal law under which a no-evidence claim is treated as a challenge to the sufficiency of the evidence under *Jackson v. Virginia,* 443 U.S. 307 (1979), and is separate from the federal right. As such, Petitioner's no-evidence claim is not cognizable on federal habeas review. *See Crouch v. Quarterman,* No. 4:07-CV-551-Y, 2009 WL 321280, at * 1 (N.D.Tex. Feb. 9, 2009) (regarding a factual-sufficiency-of-the-evidence claim).

**C. Ineffective Assistance of Appellate Counsel**

Under his third ground, Petitioner claims his appellate counsel was ineffective by raising three meritless hearsay issues in appellant's brief and failing to raise sufficiency of the evidence. (Pet. 9, doc. 3.)

A criminal defendant has a constitutional right to the effective assistance of counsel on the first appeal as of right. U.S. CONST. amend. VI, XIV; *Strickland v. Washington,* 466 U.S. 668, 688 (1984); *Anders v. California,* 386 U.S. 738, 744 (1967). establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland,* 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697.

In applying this test, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or was based on sound strategic motives. *Id.* at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Where a petitioner's ineffective-assistance claims have been reviewed on their merit and denied by the state courts, federal habeas relief will be granted only if the state courts' decision was contrary to or involved an unreasonable application of the *Strickland* standard in light of the state-court record. *Richter,* 562 U.S. at 100-01 (quoting *Williams,* 529 U.S. at 410); *Bell v. Cone,* 535 U.S. 685, 698-99 (2002). Thus, a federal court's review of state-court decisions regarding ineffective assistance of counsel must be "doubly deferential" so as to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster,* 563 U.S. 170, 190 (2011)).

To prevail on his claim of ineffective assistance of counsel on appeal, it was necessary for Petitioner to show that had counsel raised sufficiency of the evidence, he would have prevailed on appeal. *Sharp v. Puckett,* 930 F.2d 450, 453 (5th Cir. 1991) (citing *Strickland,* 466 U.S. at 687). However, the state habeas court found that counsel's decision not to raise the issue was not objectively

unreasonable and that there was no reasonable probability that, but for counsel's failure to do so, Petitioner would have prevailed on appeal. (SHR 108, doc. 13-36.) Based on those findings, which were later adopted by the Texas Court of Criminal Appeals in denying relief, the state court concluded that Petitioner failed to establish either prong of the *Strickland* standard. (Id.)

Petitioner has failed to present clear and convincing evidence in rebuttal. Nor has Petitioner presented legal argument in this federal habeas action that could lead the Court to conclude that the state courts unreasonably applied the standard set forth in *Strickland* based on the evidence presented in state court. 28 U.S.C. § 2254(d). Appellate counsel is not required to urge every possible argument, regardless of merit. *Smith v. Robbins,* 528 U.S. 259, 288 (2000)*; Sharp,* 930 F.2d at 452. It is counsel's duty to choose among potential issues, according to his judgment as to their merits and the tactical approach taken. *Jones v. Barnes,* 463 U.S. 745, 749 (1983). Conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to meet *Strickland* standards. *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir.1998).

## V. CONCLUSION

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Further, Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. A certificate of appealability may issue "only if the petitioner has made a substantial showing of the denial of a constitutional right." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). "Under this standard, when a district court denies habeas relief by rejecting constitutional claims on their merits, 'the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *McGowen v. Thaler,* 675 F.3d 482, 498 (5th Cir. 2012) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). When the district court denies the petition on procedural grounds without reaching the merits, the petitioner must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (quoting *Slack,* 529 U.S. at 484) Petitioner has not made a showing that reasonable jurists would question this Court's resolution of Petitioner's constitutional claims and/or procedural rulings. Therefore, a certificate of appealability should not issue.

SIGNED March 8, 2019.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE